FILED

2022 Oct-18  AM 11:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ASHLEY MILTON,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.: 2:21-cv-00135-ACA** |
| | ] | |
| **GRAY MEDIA GROUP, INC.,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## <u>MEMORANDUM OPINION</u>

This employment discrimination case comes before the court on Defendant Gray Media Group, Inc.'s motion for summary judgment. (Doc. 25). Plaintiff Ashley Milton alleges that Gray discriminated against her because she is African-American for several years before constructively discharging her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. (Doc. 1-1 at 2–5). Gray moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, asserting that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. (Doc. 25). For the following reasons, the court **WILL GRANT** the motion for summary judgment.

## I. BACKGROUND

On a motion for summary judgment, the court "draw[s] all inferences and

review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

Here, the court must first clarify the sources of all the summary judgment facts. Ms. Milton relies almost entirely on three documents—her complaint, her declaration, and a declaration from her former coworker, Sheena Gamble—in asserting her version of the facts and disputing Gray's statement of facts. (*See* doc. 34 at 4–13). The court will disregard Ms. Milton's references to her complaint because allegations in an unsworn complaint cannot create genuine disputes of material fact on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Ms. Gamble's declaration is problematic. Eight of the 17 paragraphs in the declaration contain inadmissible hearsay from unnamed declarants. (*See* doc. 34-1 at 1–2 ¶¶ 4–5, 7–10, 13–14). "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment. . . . Nevertheless, a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (internal citations and quotations omitted). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant

testify directly to the matter at trial." *Id.* at 1294. But those hearsay statements in Ms. Gamble's declaration attributed to unknown coworkers and managers cannot be reduced to admissible form at trial because nothing in the record identifies the declarants. *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir.), *amended on reh'g in part*, 102 F.3d 1118 (11th Cir. 1996) ("There is nothing to indicate that Pritchard's statements (which were based on the statements of unknown co-workers) will lead to admissible evidence."). So, the court will not consider paragraphs 4, 5, 7, 8, 9, 10, 13, or 14 in Ms. Gamble's affidavit as evidence capable of creating a genuine dispute of material fact.

Accordingly, these are the summary judgment facts construed in the light most favorable to Ms. Milton.

Ms. Milton started working as an account executive for WSFA, a television news station and subsidiary of Gray, on June 9, 2014. (Doc. 34-2 at 1 ¶ 4). Her job was to sell advertising spots. (Doc. 27-9 at 13 ¶ 7). She initially earned a base annual salary of $22,000 plus commissions on sales of television commercials and digital advertisements. (Doc. 27 at 11–12, 70). She was given a book of business and also expected to bring in new business. (*Id.* at 11).

Ms. Milton received her first performance evaluation on February 10, 2015. (Doc. 27 at 14; doc. 27-1 at 1). She received a "Below Average" overall evaluation, in part because her evaluator reported that Ms. Milton "need[ed] to put forth more

effort in becoming proficient in all aspects of the position," "require[d] extra supervision to finish tasks," and "require[d] much supervisory guidance . . . to solve job problems." (Doc. 27-1 at 1).

A letter accompanying the evaluation stated that Ms. Milton missed her new business goal by 43%. (Doc. 27-1 at 2). Ms. Milton testified that she would have been terminated if she actually missed her new business goal by 43% because "it was [her] understanding that [Gray] terminated people who didn't hit goals." (Doc. 27 at 14).

Gray placed Ms. Milton on her first performance improvement plan ("PIP") on July 1, 2015.[1] (Doc. 27-1 at 3). The PIP informed her that she failed to meet several business goals in 2015, submitted incomplete and incorrect business forecasts, was inaccurate in accepting and entering orders, and made "[i]ssue-based, negative comments to the team." (*Id.* at 3–4). The PIP informed her that she was required to make at least 25 new direct sales calls each week, make eight sales presentations each week, and maintain accurate orders and records. (*Id.* at 4). She would be subject to termination if she failed to meet those requirements. (*Id.*).

---

[1] At her deposition, Ms. Milton testified that she never knew the PIP existed or that it was "manufactured" for this litigation (*see* doc. 27 at 17, 19–20), but she admitted to the PIP in her brief in response to the motion for summary judgment (*see* doc. 34 at 5–6 ¶ 6). In fact, she admitted almost all of Gray's statement of purportedly undisputed facts. (*See id.* at 4–9). She devoted most of her statement of facts to conclusory allegations and legal arguments, the most repeated of which is that PIPs, account transfers, and new lead assignments were racially discriminatory. (*See, e.g.*, *id.* at 5–9 ¶¶ 6, 10, 18).

On July 7, 2015, Ms. Milton's supervisor, Kerry Morrison, told her that Gray was transferring several of her accounts to other account executives. (Doc. 27 at 18–20). Seemingly ten of those accounts were accounts that she was only temporarily "babysitting," and at least seven apparently permanent accounts were also taken away. (Doc. 27 at 18–19; doc. 27-1 at 6; doc. 27-11 at 45; *see also* doc. 27 at 54). Ms. Morrison and her supervisor, Carrie Yates, informed Ms. Milton that she was losing those accounts because she did not work well with advertising agencies, and all those accounts were "agency accounts," meaning that Ms. Milton would have to interact with an agency instead of directly with the customer. (Doc. 27 at 19–20; doc. 27-11 at 20 ¶ 9). In response, Ms. Milton sent an email to the WSFA general manager, Eric Duncan, accusing Ms. Morrison of leaving her with only "a few ethnic based accounts" and "some agency accounts that are not currently advertising at this time." (Doc. 27-1 at 6; *see* doc. 27 at 20).

Ms. Milton testified that the account shifting in 2015 was the first "issue"— either an instance of discrimination or background for later discrimination—that she experienced. (Doc. 27 at 13). However, she admitted that she requested to work with local accounts directly rather than agency accounts and wanted the agency accounts to remain off her list of accounts. (*See* doc. 30 at 5–6 ¶ 14 (citing doc. 27-11 at 20–21 ¶¶ 8–9); doc. 34 at 8 ¶ 14). She also admitted that Gray transferred her automotive accounts to another account executive who had significant car dealership

experience and was hired specifically to target and handle automotive accounts.  (*See* doc. 30 at 6 ¶ 16 (citing doc. 27-11 at 21 ¶ 11); doc. 34 at 8 ¶ 16).

At her deposition, counsel for Gray asked Ms. Milton why she thought the account transfers were discriminatory.  (Doc. 27 at 21).  Ms. Milton responded, "My whole tenure with Kerry [Morrison], everything she did was discriminatory against me."  (*Id.*).  When pressed for examples, Ms. Milton described an instance in 2015 or 2016 when Ms. Morrison, instead of sending flowers and condolences like she had done for other employees, sent a work computer to the hospital where Ms. Milton was with her son who had pneumonia.  (*Id.*).  Ms. Milton also testified that Ms. Morrison was responsible for when, after Ms. Milton's stepmother died, "instead of giving condolences messages, [Ms. Milton] was greeted by a message from IT telling [her] that [she] was tracked on [her] cellphone by management and that [she] needed to cut off [her] cellphone."  (*Id.*).  On another occasion, Ms. Morrison allegedly wrote Ms. Milton up for something she did not do because Ms. Morrison believed that Ms. Milton said she was having an affair.  (*Id.* at 21–22).  Also, according to Ms. Milton, Ms. Morrison falsely asserted that Ms. Milton was underperforming compared to other account executives.  (*Id.* at 22).

Gray placed Ms. Milton on PIPs in 2017, 2018, and 2019 for consistent poor performance, mostly because she failed to meet quarterly budget goals.  (Doc. 27-11 at 22 ¶ 14; *see* doc. 27-9 at 28, 32, 35; doc. 27-10 at 9–10, 15).  Ms. Milton herself

created one of her PIPs in September 2019.  (Doc. 27-11 at 1–5).  In that PIP, she acknowledged that she was below budget goals and gave herself specific tasks to increase billing.  (*Id.* at 2–3).  For example, her PIP stated that she would increase WSFA billing by 38% by making 20 cold calls and four presentations each week. (*Id.* at 2).

Gray's undisputed documentation shows that Ms. Milton's performance had not sufficiently improved by the end of 2019.[2]  (*See* doc. 27-10 at 1–26; *see also* 27-5 at 12).  In November 2019, she achieved only 71% of her budget goal for WSFA television advertisements, 47% for digital advertisements, 4% for advertisements on WSFA's "Bounce" channel, and 16% for new business development.  (Doc. 27-10 at 26).  Her supervisor scheduled a meeting for December 16, 2019 to review her performance and inform her that Gray would give her until the end of December to achieve the PIP goals.  (*Id.* at 29–30).  Ms. Milton resigned right before the meeting. (*Id.* at 30, 32).  She wrote in her resignation notice that WSFA had become a hostile and toxic work environment for her.  (*Id.* at 32).  She also wrote that it was difficult and uncomfortable for her to work because of race discrimination.  (*Id.*).

At her deposition, Ms. Morris explained the basis for the race discrimination allegation in her resignation notice.  First, she asserted that she was held to a higher

---

[2] Ms. Milton disputes Gray's explanation for placing her on the PIPs, but she does not dispute Gray's metrics showing that she did not achieve the minimum standards set forth in the PIPs.  (*See, e.g.*, doc. 34 at 5–9 ¶¶ 6, 10, 18).

standard than her white counterparts because of her race.  (Doc. 27 at 45).  For example, her PIP dated November 11, 2019 provides that, because of consistent poor performance, Ms. Milton would have to "[i]ncrease the number of cold calls each week from 10 to 15," "[i]ncrease the number of asks each week from 10 to 15," "[i]ncrease the number of multi-screen proposals from 2 to 5," note all appointments and pitches in Outlook and send them to all sales manages, and attend weekly reviews.  (Doc. 27-4 at 19).  Ms. Milton testified that those performance goals were discriminatory and unreasonable because "it was already hard to get from 10 to 15 [cold calls and asks] -- from 10, and then they wanted me to go from 15.  It's just a strenuous amount of busy work and double-checking and micromanagement.  You couldn't basically do the job."  (Doc. 27 at 45).  She testified, "Nobody was at budget, the station wasn't at budget, so why wasn't everybody placed on consistent poor performance monthly review" or "told that they had however many days to turn it around or they were going to be terminated repeatedly for years."  (*Id.*).  She was allegedly held to higher performance standards even though she "did the same things [her white counterparts] did" and "laughed at times and joked at times just like they did."  (*Id.*).

Further, Ms. Milton testified, "My coworkers repeatedly said, well, you're black, you can get away with anything, you can just go file discrimination.  You are black, you can do this. . . .  [T]here was always stuff like that being said."  (Doc. 27

at 46).  Counsel for Gray asked Ms. Milton who said those things, and Ms. Milton responded "[a]ll of them," Lisa Beard, and Shea Dunaway.  (*Id.*).

Similarly, Ms. Milton testified that she overheard Ms. Morrison say to another employee, "Why is she still here, she is not making any money."  (Doc. 27 at 59). Ms. Morrison also allegedly said that she and Gray did not care if Ms. Milton sued. (*Id.*).  But Ms. Milton never heard Ms. Morrison say Ms. Milton's name, and only assumed that Ms. Morrison was talking about her because "who else would she be talking about when all of that was going on?"  (*Id.*).

Next, Ms. Milton testified about an allegedly racist incident at work involving a sock monkey.  (Doc. 27 at 46).  Approximately two years before Ms. Milton resigned, she and "[p]retty much everybody that worked there" saw a sock monkey hanging by its hands from the ceiling above the sales floor.  (*Id.* at 46–48, 59). According to Ms. Milton, "all of the white people thought it was funny while the black people were extremely upset and talked about it in outrage."  (*Id.* at 46).  The general manager, Mark Bunting, was playing with the sock monkey while it was hanging by touching it and "[m]aking noise like it was a joke."  (*Id.* at 48).  Someone pulled the monkey down from the ceiling and then Mr. Bunting "came by and played with it . . . , thought it was a joke and thought it was funny."  (*Id.* at 46).  Ms. Gamble testified that she also saw the sock monkey hanging from the ceiling.  (Doc. 34-1 at 1 ¶ 12).

In addition, Ms. Milton testified about racial slurs.  (Doc. 27 at 47).  She testified that her white coworker, Jesse, called her ghetto to her face.  (*Id.*).  Jesse also allegedly said, "I can't stand those people, they make me sick," when she saw an Asian employee.  (*Id.*).  And Jesse allegedly "called another black coworker a trick."  (*Id.*).

Further, as another instance of alleged race discrimination, Ms. Milton testified that "managers," "everybody," or "people in the news" tried to figure out how she could afford Louis Vuitton shoes or purses.  (Doc. 27 at 59).  She testified that Mr. Bunting "would introduce [her] as the person -- this is Ashley, she never wears the same thing twice," which Ms. Milton considered racist because "[w]hy does it matter where I get my stuff from or how I can afford -- my god, you have on $700 shoes.  I mean, why is that any of your concern."  (*Id.*).

Ms. Milton filed a charge of discrimination with the EEOC on November 15, 2019.  (Doc. 27-5 at 6–7).  The allegations in her charge mirror those in her complaint; she alleged to the EEOC that Gray discriminated against her because of her race by taking away some of her accounts, assigning new leads to white employees unless the leads were black-owned businesses or low-value accounts, and placing her on PIPs.  (*Id.* at 6).  The EEOC investigated Ms. Milton's allegations and determined that Gray placed similarly situated white account executives on PIPs for the same reasons it placed Ms. Milton on PIPs.  (*Id.* at 9).  The EEOC sent Ms.

Milton notice of her right to sue, and she commenced this action on December 14, 2020.  (*See* doc. 1-1 at 2).

Ms. Milton raises two claims against Gray: Title VII race discrimination/constructive discharge and § 1981 race discrimination.  (Doc. 1-1 at 4–5).  For both claims, she alleges that Gray discriminated against her because of her race by giving away several of her accounts to white account executives, assigning all new leads to white account executives unless the lead was a black-owned business or a low-value account, and reprimanding her and placing her on PIPs while not doing the same to her white coworkers.  (*Id.* at 3–5).  She also alleges that the sock monkey incident was a racially charged exhibition and mentions a white coworker calling her ghetto.  (*Id.* at 4 ¶¶ 18–20).  She alleges that Gray's actions show a scheme to "starve" her out of the company because of her race, which, according to Ms. Milton, left her no choice but to resign.  (*Id.* at 4–5 ¶¶ 26–31).  In other words, she alleges that Gray constructively discharged her employment by committing intolerable race discrimination.

## II.   DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318.  "[T]here is a genuine issue of material fact if

the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).   Similarly, § 1981 prohibits intentional discrimination "in private employment on the basis of race." *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459–60 (1975).  Title VII and § 1981 claims based on the same facts "'have the same requirements of proof and use the same analytical framework.'" *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256–57 (11th Cir. 2012) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).

Here, Ms. Milton relies on circumstantial evidence to support her claims.  A plaintiff may use circumstantial evidence to prove intentional discrimination in several ways.  *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc).  As one option, the plaintiff may employ the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Id.*  The plaintiff also may "present[] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional

discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quotation marks omitted). Additionally, the plaintiff may present circumstantial evidence in any form, "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff." *Id.*

1. *McDonnell Douglas*[3]

To succeed under *McDonnell Douglas*, Ms. Milton must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) Gray treated similarly situated employees outside of her protected class more favorably; and (4) she was qualified to do her job. *See McDonnell Douglas*, 411 U.S. at 802. If she establishes this *prima facie* case of discrimination, then the burden shifts to Gray to articulate a legitimate, non-discriminatory reason for its actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). If Gray sustains its burden, then Ms. Milton must offer evidence that Gray's proffered reason is really a pretext for unlawful discrimination. *Id.* at 255–56.

a. **Adverse Employment Action**

An "adverse employment action" under Title VII is an action that "impacted

---

[3] Ms. Milton does not explicitly raise *McDonnell Douglas* as a method of proof for her discrimination claims. Instead, she asserts that she "is proceeding under the 'convincing mosaic' theory." (Doc. 34 at 24). Even so, in her brief in response to the motion for summary judgment, she sets out the *McDonnell Douglas* framework and invokes elements of the *McDonnell Douglas prima facie* case. Therefore, the court will analyze her claims under *McDonnell Douglas* in addition to the "convincing mosaic" framework.

the terms, conditions, or privileges" of the plaintiff's employment "in a real and demonstrable way." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920–21 (11th Cir. 2018) (alteration and quotation marks omitted). The adverse employment action "cannot be speculative" and "must at least have a tangible adverse effect on the plaintiff's employment." *Id.* (alteration and quotation marks omitted). The change in the terms, conditions, or privileges of employment must be "*serious and material . . . so that a reasonable person in the circumstances would find the employment action to be materially adverse.*" *Id.* (emphasis in original) (alteration and quotation marks omitted).

A constructive discharge is an adverse employment action. *Davis v. Legal Servs. Ala., Inc.*, 19 F.4th 1261, 1267 (11th Cir. 2021). "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Id.* at 1268 (citing *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009)). To prove a constructive discharge, the plaintiff "must show that the work environment and conditions of employment were so unbearable that a reasonable person in [her] position would be compelled to resign." *Bryant*, 575 F.3d at 1298 (quotation omitted). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (citing *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316–18 (11th

Cir. 1989)) (affirming the district court's conclusion that the plaintiffs suffered a hostile work environment but were not constructively discharged).

Here, Ms. Milton asserts that Gray constructively discharged her by "starving her out" until she had no choice but to resign at the end of 2019. (Doc. 1-1 at 3–4 ¶¶ 25–31; doc. 34 at 3, 6–7, 10–11, 20, 27, 32; doc. 34-2 at 1 ¶ 5). She contends that Gray did so by transferring many of her accounts to her white counterparts, assigning new leads to her white counterparts instead of her unless the lead was a black-owned business or perceived to be lower value, and placing her on unwarranted and unreasonable PIPs. (Doc. 34 at 3, 5–8, 20–21; doc. 34-2 at 1 ¶¶ 5–6). It is not clear whether Ms. Milton additionally alleges that each individual part of the "starving out" process was itself an adverse employment action, but the court will consider the actions individually and collectively.

First, Gray did not commit an adverse employment action when it transferred some of Ms. Milton's accounts in 2015.[4] It is undisputed that Gray took away only agency accounts in 2015 because Ms. Milton did not work well with agencies, she requested to remain off agency accounts, and some of the accounts were only

---

[4] Gray asserts that the statute of limitations bars any claims based on the account transfers in 2015. (Doc. 30 at 9–12). Ms. Milton responds that she permissibly relies on the account transfers as background evidence in support of her timely constructive discharge claim. (Doc. 34 at 15–16) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1179 (11th Cir. 2995), and *Downey v. S. Nat. Gas Co.*, 649 F.2d 302, 305 (5th Cir. 1981)). The court assumes without deciding that Ms. Milton is correct. Regardless, the results are the same.

temporarily assigned to Ms. Milton. (*See* doc. 27 at 18–20; doc. 27-11 at 20 ¶ 9; doc. 34 at 8 ¶¶ 14, 16). Even without that evidence, the transfers would not be adverse employment actions because there is no evidence on the record as to what extent the transfers impacted her commissions or other employment terms. So, no evidence supports a reasonable inference of any material adverse impact from the account transfers.

Second, no evidence in the record identifies a single new lead that Gray allegedly unreasonably or discriminatorily assigned to another account executive instead of Ms. Milton. So, the alleged assignments of new leads had only a speculative impact on Ms. Milton's employment.

Third, no evidence supports a reasonable inference that the PIPs had a sufficiently adverse impact on Ms. Milton's employment. The court recognizes persuasive authority supports the proposition that placement on a PIP can be an adverse employment action under Title VII. *See Howell v. Compass Grp.*, 448 F. App'x 30, 36 (11th Cir. 2011) (finding that a reasonable jury could find that a PIP was an adverse employment action because the PIP in that case was "isolated" and directed to the plaintiff "as a disciplinary action"); *Smith v. Quintiles Transnat'l Corp.*, 509 F. Supp. 2d 1193, 1203 (M.D. Fla. 2007) (finding that a PIP was an adverse employment action because the PIP "was an explicitly disciplinary measure, the implementation of which had a material adverse effect on the Plaintiff's

employment and resulted in an increased workload, increased reporting requirements, and increased supervision," and the PIP "temporarily prevented the Plaintiff from receiving pay raises or bonuses."). But a PIP, like any employment action, is not actionable under Title VII unless it has a tangible and material adverse employment impact. *See Redd v. United Parcel Serv., Inc.*, 615 F. App'x 598, 603 (11th Cir. 2015) ("[C]onclusory and vague references to additional paperwork and unspecified increased work and hours are insufficient to create a genuine issue of material fact as to whether the []PIP resulted in a serious and material change to the terms and conditions of Redd's employment."); *Edwards v. Nat'l Vision, Inc.*, 946 F. Supp. 2d 1153, 1175 (N.D. Ala. 2013), *aff'd*, 568 F. App'x 854 (11th Cir. 2014) (finding that reprimands, lowered performance evaluations, and instructions to perform additional work do not by themselves show that a PIP is materially adverse). But here, the record lacks evidence from which a jury could make a non-speculative finding as to whether Ms. Milton's PIPs were adverse employment actions.

Ms. Milton offers only her opinion that the PIPs were unwarranted and set unattainable or unreasonable goals. (Doc. 34-2 at 1 ¶ 6). She did not cite any part of her deposition testimony to support her argument, and, having reviewed all of her deposition, it seems that the only specific performance goal that Ms. Milton mentioned—as opposed to the several vague accusations that she made against the PIPs—was having to make 15 cold calls and asks a week instead of 10. (*See* doc.

27 at 45). But the increase in cold calls, without more, is not a material adverse employment action. After all, in the PIP that she created for herself, Ms. Milton stated that she would make 20 cold calls each week. (Doc. 27-11 at 2). Moreover, besides increased supervision and regular meetings, no evidence suggests that the PIPs gave Ms. Milton responsibilities beyond those which would be expected for any account executive to meet budget goals.

The final question for the adverse employment action element of Ms. Milton's *prima facie* case is whether she has produced sufficient evidence of a constructive discharge. Again, she alleges that Gray constructively discharged her by taking away some of her accounts, assigning her only low-value or black-owned business leads, and placing her on several PIPs. She might also testify at trial about the following events to prove her constructive discharge claim: Ms. Morrison did not send flowers and condolences when Ms. Milton's son was in the hospital or when her stepmother died (doc. 27 at 21); Ms. Morrison wrote Ms. Milton up for something she did not do because Ms. Morrison believed that Ms. Milton said she was having an affair (*id.* at 21–22); the sock monkey incident; some coworkers said that Ms. Milton could get away with anything because she was black and could file for discrimination (*id.* at 46); Ms. Milton assumed that Ms. Morrison was talking about her when she overheard Ms. Morrison say, "Why is she still here, she is not making any money" (*id.* at 59); a white coworker called Ms. Milton ghetto, said

Asian people made her sick, and called another black coworker a trick (*id.* at 47); some coworkers questioned how she could afford Louis Vuitton (*id.* at 59); and the general manager introduced Ms. Milton as the person who "never wears the same thing twice" (*id.*).

Ms. Milton's evidence does not support a reasonable inference that Gray deliberately made her working conditions so intolerable that any reasonable person in her position would be compelled to resign. The account transfers, unspecified lead assignments, and PIPs had no material adverse impact on Ms. Milton's employment. There is no evidence that the racist implication of a monkey played any part in someone displaying and playing with the sock monkey. Her relationship with Ms. Morrison was strained but far from intolerable under the constructive discharge standard. The coworker calling Ms. Milton "ghetto" was a stray remark made at some unknown time, and that person did not direct her other stray racist remarks at Ms. Milton. The general manager's introduction of Ms. Milton as someone who never wears the same thing twice was racist only in her opinion. And the other stray comments made by unnamed people on unknown dates—the Louis Vuitton comments and saying Ms. Milton could get away with anything because she could file a race discrimination claim—did not contribute to intolerable working conditions.

Further, Ms. Milton did not provide a close approximation for when some of those events occurred over the course of her five-year tenure. Ms. Milton does not need precise dates to prove a constructive discharge, but the fact that she experienced those alleged incidents of discrimination at vague times over the course of five years belies her contention that at some moment her working conditions crossed the unbearable threshold. She might allege that her performance review meeting— which itself is far from intolerable—scheduled for the same day that she resigned, December 16, 2019, was the straw that broke the camel's back, but, in reality and in her own words, she resigned because she "was at [her] wit's end. It was just constant nitpicking and targeting, [she] was targeted daily. It was always something, it was never a normal day, it was always something." (Doc. 27 at 60). The "nitpicking," according to Ms. Milton, was "just the point that [she] was even placed on a PIP. It was just like little small things, too. [She did not] recall everything because [she] wasn't in a good place because [she] was just so frustrated and upset and just hurt." (*Id.*). But vague nitpicking, "targeting," "small things," and frustration are not intolerable working conditions and could not support a jury finding of constructive discharge.

Accordingly, Ms. Milton has not presented sufficient evidence showing a genuine issue for trial as to whether she suffered an adverse employment action. Therefore, she failed to state a *prima facie* case under *McDonnell Douglas*.

### b.  Comparators

Ms. Milton's *prima facie* case also fails for lack of a valid comparator.[5]  To show that Gray treated similarly situated white employees more favorably, Ms. Milton would first have to "demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'"  *Lewis*, 918 F.3d at 1218.  Ordinarily, a comparator similarly situated to the plaintiff in all material respects "will have engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and "will share the plaintiff's employment or disciplinary history."  *Id.* at 1227–28 (citations omitted).  These factors are not absolute and "a valid comparison will turn not on formal labels, but rather on substantive likenesses."  *Id.* at 1228.  In other words, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'"  *Id.* (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)).

In her deposition and responses to Gray's interrogatories, Ms. Milton named Candice King, Keith Baker, Lisa Beers, Shea Dunaway, Christine Rogers, Ashley

---

[5]  Although Ms. Milton asserts that she "is not even arguing that there are any 'strict' comparators in this case" (doc. 34 at 24), she repeatedly testified and alleged in her complaint and response that Gray treated her white counterparts differently.

Romano, Jessie Morgan, Greg Price, and Ms. Morrison as comparators. (Doc. 27 at 33, 40–42; doc. 27-11 at 43–44). None of these purported comparators were similarly situated to Ms. Milton in all material respects. Greg Price and Ms. Morrison were managers (doc. 27-9 at 13 ¶ 10; doc. 27-11 at 20 ¶ 5), not account executives like Ms. Milton, so there is no meaningful comparison between them as to account transfers, lead assignments, or performance. Lisa Beers, Shea Dunaway, Ashley Romano, Jessie Morgan, and Keith Baker were account executives, but it is undisputed that those account executives did not have the same performance issues as Ms. Milton and therefore were not treated like her (*see* doc. 27-9 at 14–15 ¶¶ 15–19; doc. 27-11 at 23 ¶¶ 19–23), so they also are not valid comparators. Candace King and Christine Rogers were account executives who, like Ms. Milton, failed to meet minimum performance metrics. (Doc. 27-5 at 11–12; doc. 27-9 at 15 ¶¶ 20–21; doc. 27-11 at 23–24 ¶¶ 24–25). However, Gray placed Candice King and Christine Rogers on PIPs just as it did to Ms. Milton (doc. 27-5 at 11–12; doc. 27-9 at 15 ¶¶ 20–21; doc. 27-11 at 23–24 ¶¶ 24–25), so Gray treated similarly situated employees the same. No other evidence in the record relates to potentially material similarities between Ms. Milton, Candice King, and Christine Rogers or Gray's treatment of them.

Without evidence that Gray treated similarly situated white employees more favorably, Ms. Milton failed to raise an inference of intentional race discrimination at the *prima facie* case stage of *McDonnell Douglas*.

### c.  Pretext

Even if Ms. Milton stated a *prima facie* case of discrimination, her claims still would fail under *McDonell Douglas* because she has not presented evidence showing that Gray's legitimate non-discriminatory reasons for its actions are pretext for race discrimination.  Again, it is not disputed that Ms. Milton did not work well with agencies, requested to remain off agency accounts, and was temporarily handling some accounts, so she has not cast any doubt on Gray's explanation for transferring some of her accounts, much less shown that race discrimination was the real reason.  Also, the record lacks any specific evidence of a single lead that Ms. Milton allegedly deserved or was low value, so Ms. Milton's opinion that Gray's lead assignments were actually motivated by race cannot create a genuine dispute of pretext.  Further, it is not disputed that Ms. Milton consistently did not meet performance metrics, so there is no question as to whether the PIPs designed to help Ms. Milton meet budget goals were actually motivated by race.

### 2.  Convincing Mosaic of Circumstantial Evidence of Discrimination

Ms. Milton asserts that she has presented a convincing mosaic of circumstantial evidence of intentional race discrimination.  (Doc. 34 at 18–32).

However, her mosaic consists only of the same evidence discussed above in the context of the *McDonnell Douglas* framework. That evidence, for the many reasons discussed above, does not support any reasonable inference that Ms. Milton ever suffered actionable race discrimination at Gray. To summarize, Gray placed all account executives who failed to meet budget goals on PIPs regardless of their race. Gray had legitimate business reasons to take away Ms. Milton's agency accounts and she requested to remain off those accounts. The record lacks sufficient evidence of lead assignments. No evidence supports a reasonable inference that race played any part in the sock monkey incident, the Louis Vuitton and related fashion comments, and her several problems with Ms. Morrison. And being called ghetto, her coworker directing two racist comments to other coworkers, and coworkers saying she could get away with anything were stray remarks made at unknown times over the course of five years. Therefore, Ms. Milton failed to present a convincing mosaic of circumstantial evidence of discrimination and did not otherwise produce any evidence that could support a reasonable inference of discrimination under Title VII or § 1981.

## III.   CONCLUSION

For the reasons explained above, there are no genuine disputes of material fact and Gray is entitled to judgment as a matter of law. Accordingly, pursuant to Rule 56 of the Federal Rules of Civil Procedure, the court **WILL GRANT** Gray's motion

for summary judgment.  The court will enter summary judgment in favor of Gray on

all claims.  A separate order will be entered.

      **DONE** and **ORDERED** this October 18, 2022.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE